IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| EDWARD ELLIOTT,<br><br>  Plaintiff,<br><br>  v.<br><br>LIFE INSURANCE COMPANY OF NORTH AMERICA, INC.,<br><br>  Defendant. | Case No. 16-cv-01348-MMC<br><br>**ORDER GRANTING PLAINTIFF'S MOTION FOR JUDGMENT; DENYING DEFENDANT'S CROSS-MOTION FOR JUDGMENT; FINDINGS OF FACT AND CONCLUSIONS OF LAW**<br><br>Re: Dkt. No. 56 |

Before the Court are (1) plaintiff Edward Elliott's ("Elliott") "Rule 52 Motion for Judgment," filed October 2, 2018, and (2) defendant Life Insurance Company of North America's ("LINA") "Cross-Motion for Judgment Under F.R.C.P. Rule 52," filed October 29, 2018. The motions have been fully briefed. Having read and considered the parties' respective arguments as well as the applicable administrative record, the Court rules as follows.[1]

## BACKGROUND[2]

Elliott was formerly employed as a Vice President with BTIG LLC ("BTIG"), a brokerage firm. (Administrative Record ("AR") 1074, 1328-1329.)[3] Through his employer, Elliott was a participant in a "Group Policy" issued by LINA that provides for payments to participants who become "Disabled" within the meaning of the policy. (AR

---

[1] By order filed January 28, 2019, the Court took the matters under submission.

[2] This section and the following sections constitute the Court's findings of fact and conclusions of law. See Fed. R. Civ. P. 52(a)(1).

[3] The Administrative Record was filed August 31, 2018.

1008-1033.) In September 2014, Elliott submitted to LINA a claim for disability benefits (AR 233, 273), in which he listed September 5, 2014, as his last day of work and stated he was unable to return to work due to a "nerve condition – severe face pains – twitching in the face" (AR 333). Thereafter, in support of his claim, he submitted, inter alia, a letter from his treating physician, who provided a diagnosis of "trigeminal neuralgia." (AR 233, 429).

LINA initially approved Elliott's claim as one for "Short Term Disability (STD) benefits" under a separate policy (AR 314) and paid benefits for approximately three months, after which the claim was denied (AR 271).[4] With respect to Elliott's claim for "Long Term Disability (LTD)" benefits, said claim was denied on February 26, 2015 (AR 232), after which, on June 9, 2015, and, again, on January 14, 2016, the denial was upheld (AR 210-211, 229).

On March 21, 2016, Elliott filed the instant action pursuant to the Employee Retirement Income Security Act ("ERISA"), seeking judicial review of the denial of his claim for LTD benefits and requesting an award of such benefits or, in the alternative, an order remanding his claim to the plan administrator for further proceedings.

Thereafter, on October 20, 2016, Elliott filed with the Social Security Administration ("SSA") an application for disability benefits, in which he alleged an "inability to function and/or work" as a result of the following impairments: "trigeminal neuralgia; chronic migraine headaches; severe facial pain; poor sleep; [and] difficulty talking due to trigeminal neuralgia." (AR 790.) On February 26, 2017, the SSA granted Elliott's application, finding he was disabled (AR 837), based on its determination that he was "[u]nable to sustain work due to pain from trigeminal neuralgia" and his medication's

---

[4]Although that decision and the other decisions referenced herein were made in written letters issued on the letterhead of Cigna Group Insurance (see, e.g., AR 210, 314), Elliott has named only LINA as a defendant, both parties, in their respective motions, refer to LINA as the entity that made the decisions here at issue, and LINA, in its answer, states it was the entity that "administered" Elliott's claim (see Answer ¶ 10). Accordingly, for purposes of the instant motions, the Court considers LINA the plan administrator.

2

"side effects of sedation and cognitive slowing" (AR 796).

On March 23, 2017, the Court approved the parties' stipulation to stay the instant action to afford LINA, in light of the SSA's decision, the opportunity to conduct further administrative proceedings. Thereafter, Elliott, in addition to submitting to LINA the SSA's decision and documents the SSA had considered in making its determination, provided LINA with his updated medical records and other evidence. (See Joint Status Report, filed June 21, 2017, at 2:10-13; AR 181, 195, 390, 835.) On July 6, 2017, LINA advised Elliott that its prior denial of his claim for LTD benefits was "unchanged" (AR 196), and, on April 10, 2018, upon reconsideration, upheld its decision not to reconsider said denial (AR 181).

On May 29, 2018, the Court, upon joint request of the parties, lifted the stay, and the parties subsequently filed the instant motions for judgment.

**LEGAL STANDARD**

Under ERISA, a plan participant may bring a civil action "to recover benefits due to him under the terms of his plan," see 29 U.S.C. § 1132(a)(1)(B), in which action the plaintiff has the burden to establish his entitlement to benefits, see Muniz v. Amec Construction Management, Inc., 623 F.3d 1290, 1294 (9th Cir. 2010).

Where, as here, a court's review of a decision to deny benefits is de novo,[5] disputes of fact are "resolved by trial." See Kearney v. Standard Ins. Co., 175 F.3d 1084, 1094 (9th Cir.), cert. denied, 528 U.S. 964 (1999). "Although Rule 43(a) requires that 'testimony' be taken in open court, the record [in an ERISA case] should be regarded as being in the nature of exhibits, which are routinely a basis for findings of fact even though no one reads them out loud." Id. Specifically, the district court tries the case "on the record that the administrator had before it." Id. at 1095. "In a trial on the record, ... the judge can evaluate the persuasiveness of conflicting [evidence] and decide which is more

---

[5]On July 5, 2016, the Court approved the parties' stipulation that the appropriate standard of review is de novo.

3

likely true." Id. In so doing, the district court "consider[s] anew both the legal and factual aspects of [the plaintiff's] claim." See Thomas v. Oregon Fruit Products Co., 228 F.3d 991, 995 (9th Cir. 2000). In other words, the district court "does not give deference to the claim administrator's decision, but rather determines in the first instance if the claimant has adequately established that he or she is disabled under the terms of the plan." See Muniz, 623 F.3d at 1295-96.

**DISCUSSION**

In his motion for judgment, Elliott states he seeks an order "overturn[ing] [LINA's] denial of his short term disability, long term disability, and life insurance waiver of premium benefit claims." (See Pl.'s Mot., first unnumbered page at line 21.) As LINA points out, however, Elliott's complaint only seeks relief with respect to the denial of benefits under the LTD policy and, further, that Elliott has not alleged he exhausted his administrative remedies as to any claim other than the claim for LTD benefits. See Vaught v. Scottsdale Healthcare Corp. Health Plan, 546 F.3d 620, 626 (9th Cir. 2008) (holding "an ERISA plaintiff claiming a denial of benefits must avail himself or herself of a plan's own internal review procedures before bringing suit in federal court") (internal quotation and citation omitted).[6] Consequently, any challenge to the termination of Elliott's claim for short-term disability benefits, as well as any challenge to any decision by LINA regarding life insurance premiums,[7] is not properly before the Court and will not be further addressed herein.

//

---

[6]Moreover, in the "Facts" section of the parties' Joint Case Management Statement, filed June 9, 2016, the only claim discussed is Elliott's claim for LTD benefits. (See Joint Case Management Statement at 2:9-15.)

[7]In his reply, Elliott asserts that, in the event the Court were to find he is entitled to LTD benefits, he would be entitled to "ancillary benefits such as the Life Insurance Waiver of Premium benefit." (See Pl.'s Reply at 1:23.) Elliott, however, has not cited any provision in the Group Policy, or in any other document in the administrative record, addressing the circumstances under which a plan participant may be entitled to any such ancillary benefit.

4

The Court next turns to the issue before it, i.e., whether Elliott is entitled to LTD benefits and/or an order remanding his claim for such benefits to LINA for further consideration.

The Group Policy, i.e., the policy that sets forth the circumstances under which a plan participant is entitled to LTD benefits, defines "Disability/Disabled" as follows:

> The Employee is considered Disabled if, solely because of Injury or Sickness, he or she is:
>
> 1. unable to perform the material duties of his or her Regular Occupation; and
> 2. unable to earn 80% or more of his or her Indexed Earnings from working in his or her Regular Occupation.
>
> After Disability Benefits have been payable for 24 months, the Employee is considered Disabled if, solely due to Injury or Sickness, he or she is:
>
> 1. unable to perform the material duties of any occupation for which he or she is, or may reasonably become, qualified based on education, training or experience; and
> 2. unable to earn 80% or more of his or her Indexed Earnings.

(AR 1011.)

The Group Policy further provides that, to be entitled to LTD benefits, the "Employee must satisfy the Elimination Period" of "180 days," which "is the period of time an Employee must be continuously Disabled before Disability Benefits are payable." (AR 1011, 1016.)

Here, because the date as of which Elliott assertedly could no longer work is September 6, 2014, the Elimination Period ended March 4, 2015. (AR 210.) Consequently, to be entitled to LTD benefits, Elliott bears the burden to show he has been continuously disabled, from September 6, 2014, through whatever date beyond March 4, 2015, he claims such benefits are owed.

The Court next turns to whether Elliott has made such a showing and, at the outset, whether he has an "Injury or Sickness." (AR 1011.)

As noted, Elliott states he ceased working for BTIG as a result of pain that his treating physician attributed to a condition known as trigeminal neuralgia. LINA contends the record lacks objective indicia to support a diagnosis of trigeminal neuralgia.

5

According to the National Institute of Health ("NIH"), trigeminal neuralgia "is a chronic pain condition that affects the trigeminal or 5th cranial nerve, one of the most widely distributed nerves in the head," see Johnson v. Life Insurance Company, 2017 WL 4180328, at *11 (D. Colo. September 21, 2017) (citing NIH "Trigeminal Neuralgia Fact Sheet"), and "causes extreme, sporadic sudden burning or shock-like facial pain that lasts from a few seconds to two minutes per episode," see Karns v. Colvin, 2017 WL 119585, at *3 (D. Kan. January 12, 2017) (citing NIH Trigeminal Neuralgia Fact Sheet). Similarly, Stanford Health Care, on its website, states trigeminal neuralgia "is characterized by sudden attacks of severe, shooting pain in the face" that "typically lasts anywhere from a few seconds to a few minutes." See https://stanfordhealthcare.org/medical-conditions/brain-and-nerves/trigeminal-neuralgia.html.[8]

Elliott's last day of work with BTIG was September 5, 2014, a Friday. The following Tuesday, September 9, 2014, Elliott was seen by Aimee C. Chagnon, M.D. ("Dr. Chagnon"), a board-certified neurologist, at which appointment Elliott reported he had missed two days of work, i.e., Monday, September 8 and Tuesday, September 9, due to pain he described as a "sharp jabbing pain in the right temple." (AR 559.) On September 23, 2014, during a subsequent appointment, Elliott reported to Dr. Chagnon that he remained unable to work "due to the pain," as well as that he felt "too dizzy and sedated and confused" due to his taking oxcarbazepine and tizanidine, two medications Dr. Chagnon had prescribed at the prior appointment. (AR 434.) In October 2014, Elliott reported to Dr. Chagnon that he had begun to experience pain in his left temple and that he continued to have the same side effects from his medications. (AR 430.) In November 2014, Elliott reported to a dental specialist, to whom he had been referred by

---

[8] In their respective briefs, the parties have cited specific webpages found on the websites of several medical providers, such as Stanford Health Care and the Mayfield Clinic. The Court understands such citations to set forth what the parties believe are generally known facts about trigeminal neuralgia. As neither party has objected to the other party's citations of this nature, the Court has considered the parties' respective citations.

6

Dr. Chagnon, that, on a daily basis, he experienced facial pain (AR 598), that his chief complaint was "sharp shooting pain in [his] face and head region" (AR 606), and that the pain was "debilitating." (AR 606). Thereafter in December 2014, as well as throughout 2015 and 2016, Elliott reported to Dr. Chagnon, as well as to other medical providers, that he experienced ongoing and at times worsening facial pain, as well as a continuance of serious side effects from prescribed medications. (See, e.g., AR 423 (reporting in March 2015 that "his facial pain has continued to worsen" and "[t]he right and left temporal pain is essentially equal"); AR 413 (reporting in July 2015 "explosions of electrical pain in the right side of the mouth"); AR 636 (reporting in October 2015 he experienced "some psychosis" as a result of taking Tegretol); AR 532 (reporting in April 2016 he was experiencing "significant sedation and cognitive slowing with most of the medications being used for the pain"); AR 715 (reporting in October 2016 he "has had an increase in his facial pain"); see also AR 416, 420, 427, 528-531, 534, 646-648, 719).

In early December 2014, Dr. Chagnon diagnosed Elliott with trigeminal neuralgia (AR 428-49), having ruled out a considerable number of other possible causes for Elliott's pain.[9] That diagnosis was later supported by Jaimie M. Henderson, M.D. ("Dr. Henderson"), a neurological surgeon with Stanford Health Care, who, after having evaluated Elliott in October 2015, found Elliott's symptoms to be "consistent" with trigeminal neuralgia, noting Elliott had "some classical elements" of such impairment (see AR 635, 638). Additionally, H. Pham, M.D., who, in January 2017, reviewed Elliott's application for SSA benefits, agreed that Elliott had trigeminal neuralgia, "given supporting ME [medical evidence] from this [claimant's] records." (AR 796-797.)

//

---

[9] Possible causes for the pain that were ruled out were a "musculoskeletal/ craniofacial" impairment (AR 428), "temporal arteritis, infection, or autoimmune disease" (AR 1055), Lyme disease (AR 1056), "demyelination" (AR 411), a "mass lesion or vascular lesion" (id.), and "degenerative changes" to the "C spine" (AR 422). Also ruled out was the possibility that the pain was a side effect of dental work Elliott had undergone shortly before he began experiencing the pain. (AR 561, 1056.)

In support of its argument as to the asserted insufficiency of such evidence, LINA points to Dr. Chagnon's report that the results of a magnetic resonance angiography ("MRA") "failed to show any vascular loop" (AR 413); in addition, LINA relies on the reports of physicians who reviewed the file for LINA and opined there was an absence of objective evidence showing a cause for Elliott's pain. (AR 342-51 (report by Stephen M. Selkirk, M.D.) at 347 (stating "there is no clinical data to support the presence of a neurological impairment"; noting "MR imaging of his brain and cervical spine . . . failed to identify [any] significant underlying pathology"); AR 917-27 (report by David Burke, M.D.) at 926 (stating "numerous tests failed to identify a tangible cause" for Elliott's pain symptoms); AR 84-87 (report by Richard Hall, M.D.) at 85 (stating record is "devoid of any documented, significant, quantified, positive, neuromuscular or clinical finding"); AR 1044-51 (report by David Ross, M.D.) at 1050-51 (stating there "were no abnormalities or findings on clinical examination").)

LINA fails, however, to explain the relevance of any such lack of objective evidence. First, as a contractual matter, the LTD defines "Sickness" as "[a]ny physical or mental illness" (AR 1027); it includes no requirement limiting the scope of covered conditions to illnesses that can be documented objectively. Further, as a medical matter, although trigeminal neuralgia "can sometimes be traced to a physiological abnormality such as a blood vessel compressing the trigeminal nerve," it is "frequently a diagnosis of exclusion after various other potential causes of facial pain are ruled out." See Johnson, 2017 WL 4180328, at *11 (citing NIH Trigeminal Neuralgia Fact Sheet).[10] Here, as set forth above, the diagnosis of trigeminal neuralgia was not made in the first instance, but, rather, after numerous other potential causes were ruled out. Moreover, contrary to LINA's argument that Elliott's "doctors were conflicted" as to whether a diagnosis of trigeminal neuralgia was proper (see Def.'s Cross-Mot. at 15:17-18), there is nothing in

---

[10]The Trigeminal Neuralgia Fact Sheet on the NIH's website was cited by Elliott and, as noted, no objection thereto has been made by LINA.

8

the record indicating any physician who examined or consulted with Elliott disagreed with Dr. Chagnon's diagnosis of trigeminal neuralgia.

Accordingly, the Court finds Elliott has a "Sickness," specifically, trigeminal neuralgia, a condition that, as set forth above, can cause acute pain.

The Court next considers whether, as a result of trigeminal neuralgia, Elliott has been unable to perform the material duties of his "Regular Occupation" (AR 1011) beginning September 6, 2014, and through a date beyond March 4, 2015.

Elliott's position as a Vice President for BTIG "required a merging of both the financial and IT worlds, as he managed developers who tested and built software to process large financial transactions for his employer." (AR 1074.) Specifically, Elliott was the "Lead/Project Manager" of eight "software developers who created software for various internal business units [of BTIG]." (AR 487.) There is no dispute that the position "required prolonged periods of focused attention" (id.) and was "very cognitively demanding and involved high levels of stress" (AR 1074).

Elliott's treating physician, the State of California, and the SSA each concluded Elliott is unable to perform the duties associated with his prior position. Dr. Chagnon, the treating physician, has opined that Elliott has been unable to return to his work beginning in September 2014 through at least March 2018, the date of the most recent report included in the administrative record, basing her opinion on, inter alia, her observations of Elliott and, as set forth in more detail above, Elliott's descriptions of the frequency and nature of his pain, as well as the types of side effects he experienced from his taking prescribed medications. (AR 362, 428, 430, 531, 533-534, 1105.) The State of California, based on Elliott's medical records, found Elliott was entitled to disability benefits beginning in September 2014, and that he was "unable to perform his . . . regular or customary work" due to a "physical or mental condition," see Cal. Unemp. Ins. Code § 2626(a), through September 25, 2015, the date on which his state benefits were "exhausted." (AR 400-401, 403-404.) The SAA found Elliott has been unable to work as of September 2014 (AR 837), and, in particular, that he is unable to perform his "past

relevant work" as a "Vice President" (AR 797);[11] its record included Elliott's medical reports and Elliott's statements that he has experienced "random frequent bouts of intense pain" that "causes [him] to not be able to complete common tasks like sitting, standing or bending" (AR 499) and that eight medications he takes cause "side effects" of "sedation," "mental confusion," and/or "nausea" (AR 506).

Although, for purposes of ERISA, the opinion of a treating physician "gets no special weight," see Jordan v. Northrop Grumman Corp. Welfare Benefit Plan, 370 F.3d 869, 879 (9th Cir. 2003), and findings by government agencies that a claimant is disabled "do not bind plan administrators," see Salomaa v. Honda Long Term Disability Plan, 642 F.3d 666, 679 (9th Cir. 2011), such opinions and findings nonetheless constitute evidence that the claimant is unable to work, see id. at 676, 679.

Dr. Chagnon's opinion is, as are the findings made by the State of California and the SSA, based in large part on each such individual or entity's accepting as credible Elliott's statements describing the frequency and intensity of the attacks of pain in his face as well as the side effects, such as sedation and mental confusion, from prescribed medications.[12] LINA argues Elliott is not credible, and, consequently, that Dr. Chagnon's opinion and the government agencies' findings do not support Elliott's claim. Accordingly, the Court next considers the question of Elliott's credibility.

As noted, Dr. Chagnon, Elliott's treating physician who has had the opportunity to work with and observe Elliott for several years, has found him credible. A court may "take cognizance of the fact (if it is a fact in a particular case) that a given treating physician has a greater opportunity to know and observe the patient than a physician retained by the plan administrator." See Jebian v. Hewlett-Packard Co. Emp. Benefits

---

[11]The SSA's disability determination, issued February 26, 2017, is subject to review in "5 to 7 years." (AR 837, 840.)

[12]Where a claimant credibly reports he is experiencing side effects from medications taken in an effort to alleviate pain, the side effects are considered in determining whether the claimant is disabled. See Demer v. IBM Corp. LTD Plan, 835 F.3d 893, 904-906 (9th Cir. 2016).

Org. Income Protection Plan, 349 F.3d 1098, 1109 n.8 (9th Cir. 2003) (internal quotation and citation omitted). Here, the Court takes cognizance of such fact, as Dr. Chagnon has set forth her observations and findings in a series of detailed notes, written over a period of several years in which she has provided medical care to Elliott, whereas none of the physicians retained by LINA examined Elliott, although, under the terms of the Group Policy, they could have done so. (AR 1022 (providing LINA has "the right to examine any person for whom a claim is pending as often as it may reasonably require").)

Additionally, the type and frequency of pain Elliott has described is consistent with the medical literature's descriptions of symptoms usually experienced by persons who have trigeminal neuralgia. See, e.g., Karns, 2017 WL 119585, at *3 (citing statement, in NIH Trigeminal Neuralgia Fact Sheet, that trigeminal neuralgia "causes extreme, sporadic sudden burning or shock-like facial pain that lasts from a few seconds to two minutes per episode"). Also, to the extent the administrative record includes documents setting forth known side effects of medications Elliott has taken, his reported side effects are consistent therewith. (See, e.g., AR 1161 (Drugs.com webpage stating "more common" side effects of baclofen include "confusion" and "drowsiness"); AR 1247 (Drugs.com webpage stating "more common" side effects of Vimpat include "sleepiness or unusual drowsiness").)

Further, Elliott's history of consistent employment beginning in 1999, while he was in college (AR 439, 486),[13] and continuing thereafter despite, at some point prior to March 2012, the onset of "chronic headaches" (AR 563), as well as during what appears to have been an approximately two-week period following the onset of "severe facial pain" symptomatic of trigeminal neuralgia (AR 333), supports a finding that his cessation of work after September 5, 2014, was due to an inability to perform his duties for BTIG rather than to a lack of motivation. See Schaal v. Apfel, 134 F.3d 496, 502 (2nd Cir.

---

[13]The record does not include evidence pertaining to his work history prior to college.

11

1998) (observing "a good work history may be deemed probative of credibility"); see also Pearsall v. Massanari, 274 F.3d 1211, 1218 (8th Cir. 2001) (noting "lack of work history may indicate a lack of motivation rather than a lack of ability").

Moreover, although, as noted, LINA now argues Elliott is not credible, LINA itself found Elliott was disabled, for purposes of its policy governing STD disability benefits, beginning September 6, 2014 through December 17, 2014 (AR 271, 314), even though such finding was dependent on Elliott's credibility, and neither in its decision terminating STD benefits nor in its papers filed in support of its cross-motion has LINA pointed to any evidence indicating Elliott's condition has improved. See Montour v. Hartford Life & Acc. Ins. Co., 588 F.3d 623, 635 (9th Cir. 2009) (discussing lack of improvement as factor bearing on disability assessment).

LINA does point out that, when provided with a surgical option in 2015, Elliott declined it, which declination, LINA asserts, supports a finding he is not experiencing pain of the magnitude he indicates.[14] The surgical option, offered by Dr. Henderson at Stanford Hospital, is microvascular decompression (AR 637-638), a form of "brain surgery," see https://mayfieldclinic.com/pe-mvd.htm, which procedure, according to Dr. Henderson, would require a hospital stay of "3-4" days and would have a "chance of long term relief . . . somewhere in the 60% range." (AR 638.)[15] Given the invasive nature of the procedure, see https://www.ninds.nih.gov/Disorders/ Patient-Caregiver-Education/ Fact-Sheets/Trigeminal-Neuralgia-Fact-Sheet (referring to microvascular decompression

---

[14]Although LINA also asserts Elliott "did not follow through on his referral to the trigeminal neuralgia clinic" (see Def.'s Cross-Mot. at 1:23), LINA offers no support for such assertion and the record is to the contrary. In particular, the record indicates Dr. Chagnon referred Elliott to the UCSF Trigeminal Neuralgia Clinic (AR 429), that Dr. Chen, a neurosurgeon at said Clinic, advised Dr. Chagnon "he felt it was useless for Mr. Elliott to be seen there" (AR 423), that Dr. Chen believed "the most appropriate person for Mr. Elliott to see" was Charles McNeill, D.D.S. ("Dr. McNeill"), the Director of UCSF's Center for Orofacial Pain (AR 423, 648), and that Elliott then did consult with Dr. McNeill (AR 646-648).

[15]Dr. Henderson did state that, where there is "radiographic evidence" of compression, the chance of long-term relief would be 80%. (Id.) Such evidence was not, however, observed in Elliott's case.

as the "most invasive of all surgeries" for trigeminal neuralgia), which involves drilling a hole in the occipital bone, removing the bone, exposing the brain, and, after the procedure is complete, replacing the hole with a titanium plate, see https://mayfieldclinic.com/pe-mvd.htm, coupled with possible side effects, which range from the more "common" effects of "decreased hearing" and "dizziness/nausea" to the less common effects of "coma" or "death" (AR 638), the Court declines to find Elliott's decision not to undergo such brain surgery is indicative of a lack of credibility.

In light of the circumstances described above, the Court finds Elliott's statements as to the frequency and intensity of the attacks of pain in his face and side effects from his medications are credible.

As noted, Elliott's position as a Vice President was "very cognitively demanding" and "required prolonged periods of focused attention." (AR 487, 1074.) For the reasons set forth above, the Court finds Elliott has shown he was unable to perform the material duties of his Regular Occupation, beginning September 6, 2014, through the 24-month period beginning March 5, 2015, and, accordingly, is entitled to LTD benefits corresponding to said period.[16]

The Court next addresses Elliott's claim for LTD benefits under the "any occupation" provision. (AR 1011.) As noted, Elliott, in his complaint, seeks either an award of such benefits or, alternatively, an order remanding the matter to the plan administrator for further proceedings.

Where, as here, a court has found a plan administrator erred in determining that a claimant is unable to perform his regular occupation, district courts commonly have found it appropriate to remand the matter to the plan administrator to determine whether the claimant is entitled to benefits under an "any occupation" provision. See Lavino v. Metropolitan Life Ins. Co., 2010 WL 234817, at *13 (C.D. Cal. January 13, 2010) (holding,

---

[16]LINA does not dispute that, in the event Elliott was unable to perform the material duties of his Regular Occupation, he was also unable to "earn 80% or more of his Indexed Earnings from working in his . . . Regular Occupation." (AR 1011.)

13

1 where plan administrator erroneously terminates LTD benefits under "own occupation" provision, "[r]emand is proper" for determination of whether claimant satisfies "any-occupation standard" in plan); Minton v. Deloitte & Touche USA LLP Plan, 631 F. Supp. 2d 1213, 1221 (N.D. Cal. 2009) (holding, where plan administrator erroneously finds claimant ineligible for LTD benefits under "own occupation" provision, claimant's claim for benefits under "any occupation" provision is properly remanded to plan administrator for consideration).

Similarly, in this instance, the Court finds it appropriate to remand the matter to LINA for a determination of whether Elliott can demonstrate he is entitled to LTD benefits under the "any occupation" provision of the Group Policy, particularly given the absence of any significant evidence from a medical provider for the period following the expiration of the Regular Occupation period.[17]

Lastly, the Court addresses Elliott's claim, made in his complaint and reiterated in his motion for judgment, that he is entitled to an award of prejudgment interest. In his motion, Elliott does not set forth any argument as to why he is entitled to such award; rather, Elliott requests he be allowed to address the matter in a motion for fees and costs he intends to file. As LINA does not object to Elliott's request to defer briefing on said issue, the Court makes no determination at this time as to Elliott's entitlement, if any, to prejudgment interest.

//
//
//
//

---

[17] The only evidence presently in the administrative record from a medical provider and addressing said period is a letter to LINA from Dr. Chagnon, dated March 22, 2018, in which she reports she has "followed" Elliott "through the present." (AR 360.) The balance of the letter responds to comments made by one of LINA's record reviewers and does not indicate any particular observations made after March 5, 2017, or treatments rendered after said date, other than to note that Elliott is "still on modafinil." (AR 363.)

14

**CONCLUSION**

For the reasons stated above:

1. Elliott's motion for judgment is hereby GRANTED, and the matter is REMANDED to LINA to (a) determine the amount of LTD benefits to which Elliott is entitled under the "Regular Occupation" provision for the 24-month period beginning March 5, 2015, and (b) consider whether Elliott is entitled to benefits under the "any occupation" provision.

2. LINA's cross-motion for judgment is hereby DENIED.

**IT IS SO ORDERED.**

Dated: July 9, 2019

MAXINE M. CHESNEY
United States District Judge